UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENE C. ZUBE, JR.,

               Plaintiff,              CIVIL ACTION NO. 11-12862

         v.                        DISTRICT JUDGE THOMAS L. LUDINGTON

COMMISSIONER OF              MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### *A.    Proceedings in this Court*

On July 1, 2011, Plaintiff filed suit seeking judicial review of the Commissioner's

decision denying his claim for social security benefits (Dkt. No. 1).  Pursuant to 28 U.S.C. §

636(b)(1)(B) and Local Rule 72.1(b)(3), the case was referred to this Magistrate Judge to review

the Commissioner's decision (Dkt. No. 3). Plaintiff's motion for remand (Dkt. No. 12) and

Defendant's motion for summary judgment are pending (Dkt. No. 15). Plaintiff also filed a

response brief (Dkt. No. 16).

### *B.    Administrative Proceedings*

Plaintiff filed his claim for benefits on November 14, 2008, alleging that he became

unable to work on November 14, 1988 (Tr. 13, 110-112). Plaintiff later amended his application

to allege disability as of November 14, 2008 (Tr. 13). The claim was initially disapproved by the

Commissioner on May 28, 2009 (Tr. 13, 45).  Plaintiff requested a hearing and, on August 19,

2010, Plaintiff appeared with counsel before Administrative Law Judge ("ALJ") John A. Ransom, who considered the case *de novo*. In a decision dated September 20, 2010, the ALJ found that Plaintiff was not disabled (Tr. 13-20). Plaintiff requested a review of this decision on October 8, 2010 (Tr. 7-9). The ALJ's decision became the final decision of the Commissioner on May 13, 2011, when, after the review of additional exhibits[1] (AC-11E, Tr. 170-172), the Appeals Council denied Plaintiff's request for further review (Tr. 1-6).

In light of the entire record in this case, this Magistrate Judge finds that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Therefore, it is **RECOMMENDED** that Plaintiff's motion for remand be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

Plaintiff was 41-years-old on the date his application for benefits was filed (Tr. 19). Plaintiff's relevant work history included employment as a convenience store clerk, laborer, oil change person, pizza delivery person, construction laborer, landscaper and car wash manager (Tr. 19). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since November 14, 2008 (Tr. 15).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: "status post head and back injury arthritis, high arches[2], major depression and a cognitive disorder" (Tr. 15).

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

[2] The arch, or instep, runs from the toes to heal on the bottom of the foot. High arch is an arch that is raised more than normal. High arch is the opposite of flat feet and tends to be painful because more stress is placed on the section of the foot between the ankle and toes. Health Guide - High Arch, *The New York Times*, http://nytimes.com/health/guides/disease/high-arch/overview.html (last visited June 19, 2012).

At step three, the ALJ found no evidence that Plaintiff had an impairment or combination of impairments that met or medically equaled one of the listings in the regulations (Tr. 16-17).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> [L]ight work...in a job that provides for a sit/stand option with no repetitive bending, twisting or turning, with occasional crawling, squatting, kneeling and stair climbing; with no use of air or vibrating tools, no work at unprotected heights or around moving machinery, with limited contact with the general public, performing simple routine tasks; with no work that requires constant close attention to detail, with only occasional supervision with all work at only a regular pace with no work on uneven surfaces (Tr. 17-18).

At step four, the ALJ found that Plaintiff could not perform any of his previous work  (Tr. 18-19).

At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as hand packer (6,000 jobs in regional economy), office machine operator (1,300 jobs in regional economy) or sorter (1,750 jobs in regional economy) (Tr. 19).

### B.    Administrative Record

#### 1.    Plaintiff's Testimony and Statements

Plaintiff testified at the hearing that he lives alone and does regular household chores such as cleaning, vacuuming, washing dishes, dusting, laundry, and occasionally rakes his small lawn (Tr. 36, 37). Plaintiff attributes most of his physical pain to an assault that occurred in August of 2007, during which he was hit in the head and back with a "two by four" resulting in leg pains and constant back pain, especially in his lower back (Tr. 31). Plaintiff also attributes some of his physical pain to congenital high arches that he had before the assault (Tr. 32).

Plaintiff testified that he has difficulty walking because of constant pain and numbness in his legs, feet, and ankles. Plaintiff further testified that he can walk only 2 to 3 blocks before he needs to stop (Tr. 32-33). He described difficulty maintaining balance and navigating uneven surfaces, including inclines and ramps (Tr. 33). He also has difficulty sitting, and he cannot sit in a padded chair with wooden arms for more than 20 minutes (Tr. 38). According to Plaintiff, he can carry between 16 and 20 pounds but finds it difficult to bend over to pick something up (Tr. 33, 38-39). Plaintiff stated that he needs to lie down and recline due to pain for thirty minutes up to a couple of hours four days per week (Tr. 35).

Plaintiff testified that he has memory and concentration issues as well as problems understanding and interacting with people. Since he was assaulted in August of 2007 (Tr. 33-34); he needs to write down appointments in order to remember them (Tr. 37). Plaintiff experiences severe headaches twice a month that cause him to have nosebleeds (Tr. 39). He no longer hunts or fishes and does not interact with friends or relatives (Tr. 37).

## 2.    Medical Evidence

The Court first summarizes the medical evidence regarding Plaintiff's physical and mental impairments before 2008, and then the medical evidence of physical and mental impairments after Plaintiff's benefit application on November 14, 2008 because there was essentially no indication in the record of ongoing treatment during 2008.

### i) Medical Evidence of Physical and Mental Impairments Before 2008

Plaintiff was admitted to St. Mary's of Michigan Medical Center on August 9, 2007 and treated for injuries due to an incident, deemed either from an assault or a fall; he remained hospitalized for thirteen days (Tr. 192). Upon admission, Plaintiff was diagnosed with an acute

intracranial hemorrhage; his diagnosis remained the same on the second day (Tr. 193). Due to a

suspected aneurysm, a CT scan of Plaintiff's head was performed on the fourth day of his

hospitalization and revealed no such condition (Tr. 218). On the fifth day, Plaintiff only

responded to painful stimuli, and he did not follow commands until the seventh day (Tr. 193).

On the ninth day in the hospital, Plaintiff started to recall some of the events surrounding

his accident, and he became oriented to person and place by the tenth day (Tr. 193). Also on the

tenth day, a doctor examined Plaintiff to evaluate spasticity of his lower extremities as well as

difficulty walking due to leg weakness (Tr. 188). The examining doctor noted Plaintiff's history

of a closed head injury with intracranial petechial hemorrhages, subarachnoid hemorrhages, and

diagnosed Plaintiff with chronic spasticity of bilateral lower extremities with hyperflexia,

increased tone, high arches as well as flexion contractures of his feet and ankles thought to be

most consistent with motor cerebral palsy probably since childhood (Tr. 190).

On the twelfth day in the hospital, Plaintiff started physical therapy and ambulated with

assistance (Tr. 193). Plaintiff was discharged to Healthsource Rehabilitation Center two weeks

after admission (Tr. 193). Upon discharge, the following issues were still to be addressed:

"resolving subarachnoid hemorrhage in the inferior left frontal lobe, demyelinating disease

changes seen to the brain on MRI, and mild bulging annulus of C4-C6" (Tr. 193).

Plaintiff received inpatient treatment at Healthsource Saginaw from August 22, 2007 to

September 19, 2007 (Tr. 239). Plaintiff was diagnosed with heel cord contractures at both ankles,

"poor heel to shin," and clumsiness of arm and leg movements, but Plaintiff experienced no calf

pain or tenderness (Tr. 241-242). Plaintiff was oriented to the date and to himself but not to

place. He could not recall events of the morning (Tr. 242). Upon discharge, the evaluating doctor

noted Plaintiff's subacute hemorrhage as identified on brain scans, his high fall risk and eventual

awareness of his difficulties, as well as his improved psychosocial problem (Tr. 239). Plaintiff received one-on-one care for most of his stay to treat his ataxia (his lack of effort to preserve himself, lack of endorsement of limitations); near the end of his stay, Plaintiff could clearly identify the risks and dangers of walking and had progressed in controlling his falling (Tr. 239). Plaintiff still required a walker most of the time, but he was able to walk unaided for short distances (Tr. 240). Before leaving Healthsource Saginaw, Plaintiff received several treatment options and recommendations (Tr. 240).

In November 2007, psychologist Sally Glowicki, M.A., examined Plaintiff for the Disability Determination Service ("DDS") for the State of Michigan (Tr. 245). Plaintiff complained that he was unable to stand for more than 10 to 15 minutes without pain, had numbness in his feet, had memory problems, and was depressed as a result of a recent major head injury and a month spent in rehabilitation (Tr. 245-246). Plaintiff had trouble walking, limped into the evaluation room and appeared to be tiptoeing, but was able to reply to questions and instructions throughout the evaluation (Tr. 248). Plaintiff demonstrated poor insight and judgment, reported daily crying spells, and stated he felt irritable three to four times a week (Tr. 248). Ms. Glowicki noted Plaintiff's significant memory problems and failure to recall the past two years. She attributed his memory loss to the head injury and years of alcoholism (Tr. 250). She diagnosed Plaintiff with recurrent, moderate, major depressive disorder, cognitive disorder, pain disorder, nicotine dependence, and alcohol dependence in early partial remission (Tr. 250).

Later in November 2007, Bret Bielawski, D.O., examined Plaintiff for the state DDS (Tr. 254-57). Dr. Bielawski noted Plaintiff's complaints which included headaches, issues with his memory and walking, as well as pain and numbness in his feet (Tr. 254). He indicated that Plaintiff had a gait abnormality caused by congenital high arches and PCL laxity in his left knee

(Tr. 256). Dr. Bielawski concluded that Plaintiff could not climb stairs, ambulate on uneven surfaces, stand for short periods of time and ambulate for short periods of time (Tr. 256).

*ii) Medical Evidence of Physical and Mental Impairments After*
*Plaintiff's Application Date of November 14, 2008*

Dr. Bielawski reexamined Plaintiff for the state DDS in April 2009 (Tr. 289-91). Plaintiff complained of daily headaches, nondescript back pain, inability to walk for more than 25 minutes, ability to sit or stand for only 15-20 minutes; he did not use an assistive device (Tr. 289). Dr. Bielawski noted Plaintiff's ability to answer questions and follow commands, his appropriate insight and judgment, as well as his intact recent memory and normal concentration (Tr. 290). Plaintiff had mild difficulty getting on and off the examination table, heel and toe walking and squatting, but Dr. Bielawski noted no evidence of joint laxity (Tr. 290). Dr. Bielawski noted a closed head injury due to a prior assault, and stated that he was more impressed with congenital high arches and polyneuropathy, thought to be from a history of alcohol abuse (Tr. 291). Plaintiff stated that he wore heavy boots to increase his balance, but Dr. Bielawski stated that Plaintiff's exam was otherwise unremarkable (Tr. 291).

Michael Brady, Ph.D., examined Plaintiff for the state DDS in May 2009 (Tr. 293-297). Plaintiff complained of depression, poor memory, irritability, decreased concentration and motivation, but no suicidal thoughts (Tr. 293). At the time of the evaluation, Plaintiff reported taking Depakote (medication used to treat bipolar disorder) but denied any past mental health services (Tr. 293). Dr. Brady noted that Plaintiff expressed well-organized thoughts and demonstrated no issues in pattern or content of speech (Tr. 295). Dr. Brady diagnosed major depressive disorder, but also stated that results of the mental status examination revealed no abnormalities in mental capacity (Tr. 296).

-7-

Later in May 2009, Plaintiff reported negative side effects from taking Paxil, including increased sweating and nausea (Tr. 442). As a result, Dr. Anne Tadeo discontinued Plaintiff's use of Paxil, started Plaintiff on Celexa, and increased Plaintiff's Depakote dosage (Tr. 442).

Two days later, Bruce Douglass, Ph.D., reviewed Plaintiff's medical records for the state DDS and created a report (Tr. 299-315). Dr. Douglass diagnosed major depressive disorder and affective disorder (Tr. 306, 311). He also noted Plaintiff's intact cognition but variance in memory and concentration (Tr. 301). He stated that Plaintiff would have trouble keeping up with complex/technical tasks, but also found that Plaintiff possessed the ability to learn, remember, understand, and perform simple, routine, 2-step tasks on a sustained basis (Tr. 301).

In June 2009, Plaintiff complained of neck pain and difficulty walking while being treated at Bayside Health Center (Tr. 375). The treatment provider diagnosed lower extremity neuropathy secondary to brain injury, neck pain, and bipolar disorder (Tr. 375). The treatment provider ordered an EMG and prescribed medication (Tr. 375).

Four days later, Douglas Ruben, Ph.D., performed a neuropsychological evaluation report of Plaintiff (Tr. 332-341). Dr. Ruben noted Plaintiff's previous psychiatric evaluations that diagnosed major depressive disorder with traumatic brain injury and Plaintiff's use of Depakote to control mood (Tr. 334). During pre-interview questions, Plaintiff ambulated independently with a normal gait showing no psychomotor disturbance (Tr. 335). Dr. Ruben also noted Plaintiff's generally strong attention span and physical stamina (Tr. 335). After psychological testing and a clinical interview, Dr. Ruben stated that Plaintiff profiles as an intellectually borderline, endogenously depressive, and interpersonally underdeveloped middle-aged adult (Tr. 339). Dr. Ruben explained indications of underachievement, rebelliousness, unmanaged anger, and polydrug abuse, all of which attributed to Plaintiff's poor intelligence, independent of his

assault (Tr. 339). Following the traumatic brain injury, Plaintiff's pre-existing areas of low-functioning worsened significantly and symptoms of depression appeared more profound (Tr. 339). Dr. Ruben diagnosed a learning disorder, uncontrolled internal emotions such as depression and anger, anticipatory aggression, as well as lower impulse control and memory deficits attributable to the traumatic brain injury (Tr. 340). Dr. Ruben noted Plaintiff's vocational training in pursuit of heavy equipment operation for re-entry into the construction field, but advised caution against use of this equipment (Tr. 341). Dr. Ruben encouraged continued therapy and counseling with the Michigan Psychological Association ("MPA") in order to help mitigate Plaintiff's problems (Tr. 341).

In August 2009, Dr. Tadeo reviewed Plaintiff's medications and reported that Plaintiff continued work as a chore provider for a woman which began in July 2009, and that Plaintiff planned to start heavy equipment training (Tr. 441). Later in August 2009, Plaintiff sought treatment for lumbar back pain at Bayside Health Center (Tr. 366). The treatment provider diagnosed onset diabetes mellitus with possible neuropathy, an abnormal EMG with lumbosacral and chronic back pain, and bipolar disorder (Tr. 366). The treatment provider prescribed medications as well as an MRI of Plaintiff's spine; the MRI showed spondylolisthesis with deformity of the facet joint with right foraminal narrowing at L5-S1, probable spondylolisthesis with foranimal narrowing at L4-5, and small disc protrusion at L3-4 (Tr. 366, 377).

In December 2009, Plaintiff reported that he completed heavy equipment training and was enrolled in Michigan Works seeking employment (Tr. 437). In late December 2009, Plaintiff received an annual assessment from the MPA where Plaintiff complained of poor memory and contemplated suicide (Tr. 431-434). Plaintiff stated he thinks he is making progress, but still experiences depression and anxiety and struggles with his physical and cognitive deficits (Tr.

433). The therapist recommended continued psychiatric medication management and medical intervention for his physical injuries (Tr. 433).

In February 2010, Plaintiff received treatment in an emergency room for left elbow pain, and it was noted that Plaintiff was tearing down mobile homes for scrap (Tr. 411-417).

In June 2010, Plaintiff was treated again. He was prescribed medications, told to ice and elevate his feet for the next five days, and told to get arch supports for his work boots because of pain in his right foot diagnosed as plantar fasciitis (Tr. 397-403). Also in June 2010, psychologist Thomas Seibert, M.S., evaluated Plaintiff for learning disabilities (Tr. 379-395). Mr. Seibert noted Plaintiff's past impairments such as depression, high arches, and traumatic brain injury (Tr. 379-382). After testing, Mr. Seibert found Plaintiff to have a cognitive disorder with all his intellectual abilities reduced to the borderline range (Tr. 393). Mr. Seibert recommended that Plaintiff consult with a neurologist to determine whether it was safe for him to operate heavy equipment, and he referred Plaintiff for a neuropsychological evaluation to assess the impact of his brain injury on his capacity to learn new job skills (Tr. 395).

### 3.    Vocational Expert

At the hearing, the ALJ asked the vocational expert ("VE") a hypothetical question regarding what jobs could be performed by a person who was capable of light work with additional limitations, including: the need for a sit/stand option; no repetitive bending, twisting, or turning; occasional crawling, squatting, kneeling, and stair climbing; no use of air or vibrating tools; no work around unprotected heights and moving machinery; no uneven surfaces; only limited contact with the public; and only simple, repetitive, regular-paced work with occasional supervision and no constant attention to detail (Tr. 42). The VE testified that such a person could

work as a hand packager, office machine operator, and sorter, with a total of 9,000 positions available in the regional economy (Tr. 42).

### C.    *Plaintiff's Claims of Error*

Plaintiff raises two arguments on appeal. First, Plaintiff argues that the hypothetical and the RFC failed to accurately portray Plaintiff's restricted range of light work, in particular Plaintiff's inability to perform the standing requirements of light work (Pl.'s Br. at 2-4).

Second, Plaintiff argues that the RFC and hypothetical failed to adequately describe Plaintiff's mental impairments. Specifically, Plaintiff argues that the ALJ's finding that Plaintiff was "moderately" impaired in maintaining concentration, persistence, or pace as well as social functioning was not reflected in the RFC (Pl.'s Br. at 4-7).

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

-11-

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability"); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility") (internal quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more

than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen*, 800 F.2d at 545).

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*)

and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*).

Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty stricken adults and

children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).

While the two programs have different eligibility requirements, "DIB and SSI are available only

for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments, that "significantly limits...physical or
> mental ability to do basic work activities," benefits are denied
> without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful
> activity, has a severe impairment that is expected to last for at least
> twelve months, and the severe impairment meets or equals one of
> the impairments listed in the regulations, the claimant is
> conclusively presumed to be disabled regardless of age, education
> or work experience.
>
> Step Four:  If the claimant is able to perform his or her past
> relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past
> relevant work, if other work exists in the national economy that the

-14-

> claimant can perform, in view of his or her age, education, and
> work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§
404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding
at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of
limitations caused by his impairments and the fact that he is precluded from performing his past
relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the
analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers
to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the
fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in
the national economy that [claimant] could perform given [his] RFC and considering relevant
vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.     *Analysis and Conclusions*

#### 1.     The ALJ's Hypothetical Question to the Vocational Expert Adequately Accounted for Plaintiff's Restricted Range of Light Work

As noted above, Plaintiff raises two arguments on appeal (Pl.'s Br. at 2-7). The first issue
is whether substantial evidence supports the hypothetical to the VE and the resultant RFC of
restricted range of light work (Pl.'s Br. at 2-4). Plaintiff asserts that "since the ability to perform
light work requires a hypothetical claimant to walk or stand six hours out of an eight hour
workday, the ALJ's Decision appears to be clearly lacking substantial evidence" (Pl.'s Br. at 4).

Where an ALJ poses a hypothetical question to a VE that fully and accurately
incorporates a claimant's physical and mental limitations, the expert's testimony in response
constitutes substantial evidence to support a finding that the claimant is capable of performing a

significant number of jobs in the national or regional economy, and thus is not disabled.  *See*

*Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).

Conversely, where the hypothetical does not accurately depict the claimant's limitations, the

VE's testimony cannot support such a finding.

A hypothetical question is not required to list all the claimant's medical conditions, but is

only required to reflect the claimant's <u>limitations</u>.  *See Webb v. Commissioner*, 368 F.3d 629, 633

(6th Cir. 2004). In evaluating the extent to which a hypothetical posed to a VE should list the

claimant's medical condition and be considered by the VE when determining the claimant's

ability to work in the national economy, the Sixth Circuit has held that such a medical list is not

required.  *See Webb*, 368 F.3d 629, 633 (6th Cir. 2004).   In an analogous case before this Court,

the claimant alleged that the ALJ "…made no mention of [Plaintiff's] chronic pain in her

knees…[and] the use of a cane…" in the hypothetical question posed to the VE. *See Jackson v.*

*Comm'r of Soc. Sec.*, 2009 WL 612343, at *12 (E.D.Mich. March 6, 2009). The Court addressed

this issue by reiterating the holding in *Webb* and stated, "contrary to what Plaintiff suggests, the

ALJ is not required to list her impairments in a hypothetical question to the VE…[and] so long as

[the] ALJ…accounted for Plaintiff's limitations in his hypothetical question to the VE, he was

not required to list her medical conditions." *Jackson*, 2009 WL 612343, at *12 (E.D.Mich.

March 6, 2009).

In this case, the ALJ adequately spoke to Plaintiff's physical and mental impairments in

the following hypothetical posed to the VE:

> ALJ:   Assume for me if you would that he could perform light work, but he'd require a
> job with the following restrictions: he'd need a sit-stand option at will, with
> occasional; and no repetitive bending, twisting or turning; occasional crawling,
> squatting, kneeling and stair climbing; no air or vibrating tools; no working
> around unprotected heights or moving machinery; no working on uneven surfaces;
> and he'd require a job with limited contact with the public; it would need to be

> simple, repetitive, regular-pace work with occasional supervision and no constant close attention to detail. Assume those facts, in your opinion, would there be jobs in significant numbers in the regional economy that he could perform? (Tr. 41-42)
>
> VE:   Yes. In the light and unskilled for the region – (Tr. 42)
>
> ALJ:  Oh, including any of his past work? (Tr. 42)
>
> VE:   Looking at past work. I don't believe any of the past work would accommodate the fully discretionary sit-stand option. So we'll be looking at other jobs that might exist in the light and unskilled. Such a worker could perform a hand packer position; 6,000. An office machine operator position; 1,300. A sorter position; 1,700 in economy (Tr. 42).

As in *Jackson*, the issue is not whether the ALJ listed each of Plaintiff's impairments in the hypothetical question, but rather, whether the question accounted for Plaintiff's limitations. *Jackson*, 2009 WL 612343, at *12 (E.D. Mich. March 6, 2009). As explained in *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001), a VE's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony was given in response to a hypothetical question that accurately set forth the claimant's physical and mental impairments. Although Plaintiff argues that the evidence shows greater impairments than found by the ALJ, it is clear from the ALJ's questions that the VE was expected to consider Plaintiff's medical limitations in walking and standing as the hypothetical included a "sit-stand option at will" and "no [work] on uneven surfaces" (Tr. 41-42). Moreover, when the ALJ asked whether Plaintiff could perform any past work, the VE responded, "I don't believe any of the past work would accommodate the fully discretionary sit-stand option," clearly indicating that the VE accounted for Plaintiff's walking and standing limitations. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, *a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg*

*controls.* 20 C.F.R. § 416.967(b) (emphasis added). Because the ALJ included a "sit-stand option" and "no [work] on uneven surfaces," this Magistrate Judge finds that the hypothetical adequately accounted for Plaintiff's standing and walking restrictions. Thus, although the hypothetical did not specifically state Plaintiff's inability to walk or stand for six hours out of an eight hour workday, the hypothetical accounted for Plaintiff's restricted ability to perform light work (i.e., need for a sit-stand option at will and no work on uneven surfaces), which rendered the hypothetical and the VE's response accurate.

Furthermore, the ALJ recognized that Plaintiff suffers from congenital high arches as well as numbing and swelling of the feet. The primary issue is whether these impairments, particularly as it relates to Plaintiff's ability to walk or stand in performing light work, is substantiated by the record and should have been considered greater impairments in the RFC and the ALJ's hypothetical question to the VE.  The ALJ is not required to include a plaintiff's claim of a medical condition if the claim is not substantiated by the record. *Jackson*, 2009 WL 612343, at *12 (E.D. Mich. March 6, 2009). *See also Stanley v. Sec'y of Health and Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994).

To resolve this issue, the Court first considers the extent to which Plaintiff's medical records demonstrate problems with walking or standing. The record regarding Plaintiff's ability to walk or stand indicates marked improvement from the time of the first examination with Dr. Bielawski in November 2007, three months after Plaintiff's closed head injury, and a subsequent examination by Dr. Bielawski in April 2009. During Plaintiff's first examination in November 2007, Dr. Bielawski noted that Plaintiff was unable to climb stairs, unable to walk on uneven surfaces, and unable to stand or walk for even short periods of time (Tr. 256). However, during Plaintiff's later examination in April 2009, Dr. Bielawski noted that Plaintiff required no

-18-

assistive device, had only mild difficulty walking without his boots, and that the heavy boots

increased Plaintiff's balance. Also, Plaintiff's PCL laxity in his left knee, diagnosed during the

first exam, was no longer an issue during the second exam (Tr. 290). Additionally, during an

evaluation in June 2010, Plaintiff told the examiner that problems with his high arches did not

cause functional limitations for him (Tr. 379-380).

Further, Dr. Douglas Ruben conducted a neuropsychological evaluation of Plaintiff in

June 2009 and noted that Plaintiff ambulated independently with a normal gait showing no

psychomotor disturbance and sat comfortably in a chair (Tr. 335). Plaintiff's own statements to

both Dr. Ruben and Dr. Tadeo are inconsistent with a finding of a disability. Dr. Ruben noted

that Plaintiff was aspiring for vocational training in heavy equipment operation for reentry in the

construction field (Tr. 341). Also, during an examination in August 2009, Dr. Tadeo noted that

Plaintiff worked as a "chore provider for a lady" that began in July 2009, and Plaintiff was

looking forward to starting heavy equipment training, which he later completed (Tr. 437, 441).

Plaintiff asserts that the ALJ's decision on its face fails to square the medical evidence

with the ability to perform light work (Pl.'s Br. at 4). However, Plaintiff exhibited improvement

since the time of the injury in August 2007 as well as an ability to perform simple tasks such as

household chores. The ALJ also noted that Plaintiff sought almost no treatment during 2008, and

determined Plaintiff's statements concerning intensity, persistence and limiting effects of his

symptoms were not credible to the extent they were inconsistent with the RFC (Tr. 18). "Since

the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect

to credibility should not be discarded lightly and should be accorded deference." *Casey v. Sec'y

of Health & Human Servs.*, 987 F.2d at 1234. After careful consideration of the entire record, this

Magistrate Judge finds that the ALJ reasonably determined that Plaintiff had the RFC to perform

light work as defined in 20 C.F.R. § 416.967(b), and included appropriate restrictions that accounted for Plaintiff's walking and standing impairments. In sum, the decision is supported by substantial evidence.

### 2. The ALJ's Hypothetical Question to the Vocational Expert Adequately Accounted for Plaintiff's Mental Limitations

Plaintiff's second argument is that the RFC and hypothetical question failed to accommodate Plaintiff's "moderate" rating in maintaining concentration, persistence, or pace (Pl.'s Br. at 4-5). Specifically, Plaintiff contends that a finding of "moderately" impaired in this area would preclude Plaintiff from performing regular paced work (Pl.'s Br. at 5).

"Concentration, persistence, or pace" refers to the claimant's ability to sustain focused attention sufficiently long to permit the timely completion of tasks found in work settings. *See Merkel v. Comm'r of Soc. Sec.*, 2008 WL 2951276, *10 (E.D. Mich. July 29, 2008), citing, 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00A.

After finding that Plaintiff was "moderately" impaired in his ability to maintain concentration, persistence or pace, the mental portion of the RFC provided for:

> [Plaintiff] require[s] a job with limited contact with the public; it would need to be simple, repetitive, regular-pace work with occasional supervision and no constant close attention to detail (Tr. 42).

The VE then determined that Plaintiff could perform work as a hand packer (6,000 jobs in regional economy), an office machine operator (1,300 jobs in regional economy) or a sorter (1,700 jobs in regional economy) (Tr. 42).

Plaintiff cites *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842 (E.D. Mich 2007) in support of his argument. In *Benton*, the Court found that the limitations included in the hypothetical question and the VE's testimony regarding the effect a lack of concentration has on

-20-

the jobs mentioned was insufficient to suitably accommodate Plaintiff's concentration limitations. *See Benton*, 511 F. Supp. 2d at 849 (citing *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005)). The *Benton* Court explained that plaintiff may not be able to meet quotas, stay alert, or work at a constant pace, even at a simple, unskilled routine job. *See Benton*, 511 F. Supp. 2d at 849. Thus, the court found there must be either a supported finding that plaintiff does not often suffer from concentration lapses, or the hypothetical to the VE must include this aspect of plaintiff's condition. *Id.*; *Thomczek v. Chater*, 1996 WL 426247, at *3 (E.D. Mich. Jan. 5, 1996).

However, after careful consideration of the evidence, this Magistrate Judge finds that the ALJ properly addressed Plaintiff's concentration within the hypothetical posed to the VE.

Although the ALJ's hypothetical stated that all work should be at a regular pace, he also added that the work be simple, repetitive, and require no close attention to detail (Tr. 42). Each of these limitations addressed Plaintiff's particular pacing requirements and appropriately limited him to regular paced work.

Plaintiff contends that production-type work is clearly inconsistent with the ALJ's rating Plaintiff as being "moderately" impaired in this area (Pl.'s Br. at 5). However, Plaintiff was able to successfully complete training as a heavy equipment operator; the ALJ properly notes that this fact is representative of Plaintiff's ability to learn and complete jobs training (Tr. 18). Furthermore, during a psychological examination in May 2009, Michael Brady, Ph.D., noted that "[Plaintiff] is currently tearing a porch off their mobile home" and results of the mental status examination revealed no abnormalities in mental capacity (Tr. 294-296); both pieces of evidence support the ALJ's determination that Plaintiff is able to perform restricted work (Tr. 18). Likewise, after an exam in May 2009, Bruce Douglass, Ph.D., concluded that although

"[Plaintiff] might have trouble keeping up with complex/technical tasks," "[Plaintiff] retains the capacity to learn, remember, understand, and perform simple, routine, 2-step tasks on a sustained basis" (Tr. 301).

Moreover, decisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work. *See e.g., Latarte v. Comm'r of Soc. Sec.*, 2009 WL 1044836, *3 (E.D. Mich. April 20, 2009); *Street v. Comm'r of Soc. Sec.*, 390 F.Supp.2d 630, 638 (E.D. Mich. 2005) (citing *Chafin v. Comm'r of Soc. Sec.*, 2005 WL 994577, *2, 4 (E.D. Mich. April 26, 2005) (ALJ's hypothetical question addressed plaintiff's mental deficiencies sufficiently by limiting him to "simple, unskilled work." Further, although plaintiff had "moderate" deficiencies of concentration, persistence, or pace he could nonetheless perform the work of an assembler, packager, inspector, and security monitor)); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 662 (E.D. Mich. 2004) ("ALJ took into account [the] [p]laintiff's depression ... by including limitations within the hypothetical ... limiting the possible jobs to simple, unskilled, and routine work").

Plaintiff also argues that the hypothetical failed to accurately describe Plaintiff's mental restrictions regarding his social functioning (Pl.'s Br. at 5-7). Specifically, Plaintiff believes that a hypothetical individual with the impoverished social skills found in the medical evidence would require more restrictions than mere "occasional supervision with all work" (Pl.'s Br. at 6). When determining Plaintiff's "social functioning," the Commissioner must decide whether the claimant can interact appropriately and communicate effectively and clearly with others. *Merkel*, *supra,* 2008 WL 2951276 *10.

Plaintiff points to Dr. Ruben's neuropsychological evaluation which found Plaintiff to be intellectually borderline, depressive and interpersonally underdeveloped (Tr. 339). Plaintiff's

social skills may cause lower impulse control, poor decisions, and weak perceptual awareness; all of which subject Plaintiff to higher risk for confrontations (Pl.'s Br. at 6). However, Plaintiff fails to recognize Dr. Ruben's entire diagnosis and report. After Plaintiff's June 2009 evaluation, Dr. Ruben assessed Plaintiff's ability to comply with Michigan Rehabilitation Services:

> Testing shows a history of tenaciously defiant behaviors. However, at present, [Plaintiff] does not appear misanthropic or exhibiting imperturbable behaviors – such characteristics are often predictors of rule violations, authority defiance and disrespect, or program failure (Tr. 341).

Also, after an examination of Plaintiff in November 2007, Dr. Bielawski stated, "[Plaintiff] is cooperative in answering questions and following commands" and "[Plaintiff] had a pleasant affect" (Tr. 255). During an examination for the state DDS, Sally Glowicki, M.A., reported that, "Rapport was easily established with this [Plaintiff]" and "[Plaintiff] was pleasant and cooperative with the interviewing" (Tr. 247-48). Contrary to this evidence, Plaintiff argues that the restrictions within the hypothetical ought to have included "no contact with the public" and only "superficial contact with co-workers" in order to isolate Plaintiff and reduce the likelihood of conflict in the work setting (Pl.'s Br. at 6). But the interactions between Plaintiff and his examiners reveal otherwise. Plaintiff is correct when pointing to Dr. Ruben's assessment, that his pre-existing low functioning worsened after the assault (Pl.'s Br. at 6); yet, the record also contains considerable evidence of positive interaction and communication between Plaintiff and medical evaluators. During a psychiatric exam in May 2009, Dr. Brady noted that "[Plaintiff] described several close friends with whom he talks occasionally" and "[t]hroughout the evaluation [Plaintiff] was cooperative and attentive" (Tr. 294, 296). In this case, the ALJ appropriately limited Plaintiff to jobs with limited public contact and only occasional supervision. The ALJ's determinations regarding Plaintiff's mental limitations are supported by substantial evidence in the administrative record, and the Plaintiff is able to perform regular

paced work. The substantial evidence standard includes a "zone of choice" within which the Commissioner can act without fear of court interference. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Indeed, where the Commissioner's decision is supported by substantial evidence, it should be affirmed, even if the Court would have reached the opposite conclusion. *Id*.

Accordingly, after review of the record, the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts" *Id., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994), as the decision is supported by substantial evidence.

## III.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion to remand be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.


s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  June 27, 2012

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 27, 2012, by electronic and/or ordinary mail.*


*s/Melody Miles*
*Case Manager*