UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GENE C. ZUBE, JR.,

                Plaintiff,

                                        Case Number 11-12862
v.                                      Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____ /

**OPINION AND ORDER OVERRULING PLAINTIFF'S OBJECTIONS,
ADOPTING REPORT AND RECOMMENDATION, DENYING PLAINTIFF'S
MOTION TO REMAND, GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT, AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**

      This case arises out of an application for social security benefits filed by Plaintiff Gene

Zube.  Defendant Commissioner of Social Security denied the application.  Plaintiff appeals that

decision.  At issue is whether Administrative Law Judge John Ransom's decision is supported by

substantial evidence.  Concluding that it is, Magistrate Judge Mark A. Randon issued a report

recommending that the Court deny Plaintiff's motion to remand, grant Defendant's motion for

summary judgment, and dismiss Plaintiff's complaint.

      Within fourteen days after being served with a copy of a report and recommendation,

any party may file written objections.  28 U.S.C. § 636(b)(1).  The district court "shall make a de

novo determination of those portions of the report . . . to which objection is made."  *Id*.  The

Court is not obligated to further review the portions of the report to which no objection was

made.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985).

      Plaintiff timely filed two objections to Judge Randon's report.  ECF No. 18.  First,

Plaintiff objects that his physical limitations have not been accurately assessed by Defendant.

Specifically, the conclusion that Plaintiff is able "to perform the walking and balancing requirements of light work is contrary to the objective medical evidence of record."  Pl.'s Objections 3, ECF No. 18.  Second, Plaintiff objects, his mental limitations have not been accurately assessed by Defendant.  Specifically, the conclusion that Plaintiff is able "to perform simple, routine tasks at a regular pace" is not supported by substantial evidence.  *Id*. at 5.

As an initial matter, the Court notes, Plaintiff's "objections" are substantively reassertions of arguments made in Plaintiff's motion to remand, not objections particularized to the report and recommendation.  *Compare, e.g.*, Pl.'s Mot. to Remand 7 ("Although the ALJ indicates that the claimant was able to complete training as a heavy equipment operator and that his attention and concentration at the time of the hearing were reasonable, this rather superficial analysis is not reflected in the objective evidence in the case record."), *with* Pl.'s Objections 5 ("The Report indicates the ALJ noted that Mr. Zube was able to successfully complete training as a heavy equipment operator which is representative of Plaintiff's ability to learn and complete job training. . . .  On its face completing training as a heavy equipment operator is inconsistent with the objective psychological testing by both Drs. Ruben and Tom Siebert.").  Nevertheless, Plaintiff is entitled to "fresh consideration" of those portions of the record which are relevant to his objections.  *See generally* 12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3070.2 (2d ed. 1997 & supp. 2010).

After considering Plaintiff's objections, however, the Court agrees with Judge Randon's conclusion.  Judge Ransom's decision is supported by substantial evidence.  Accordingly, the Court will adopt the report and recommendation, deny Plaintiff's motion to remand, grant Defendant's motion for summary judgment, and dismiss Plaintiff's complaint.

# I

The Commissioner of Social Security determines whether a claimant is disabled in accordance with a five-step process.  20 C.F.R. § 404.1520(a)(4)(i)–(v).  A claim is allowed when it is demonstrated that: (1) the claimant is not engaged in "substantial gainful employment"; (2) the claimant suffers from a severe impairment which has lasted or is expected to last for twelve continuous months; (3) the impairment meets or is equal to one of the enumerated impairments; (4) ;  the claimant does not retain the "residual functional capacity" to perform his "past relevant work"; and (5) the claimant is unable to perform any other gainful employment in light of the claimant's "residual functional capacity, age, education, and work experience."   20 C.F.R. § 416.920(a)(4)(i)–(v).   "The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) (citing 20 CFR § 404.1520 (1982)).  "If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]."  *Id.*

The Court reviews the administrative law judge's decision to determine whether the "factual findings . . . are supported by substantial evidence."  *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) (citing 28 U.S.C. § 405(g)).  Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A district court does not resolve conflicts of evidence or issues of credibility.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  If the administrative law judge's decision is supported by substantial

evidence, it must be affirmed, even if substantial evidence supports the opposite conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

## II

### A

Plaintiff is a forty-four year-old man. R. at 19. He graduated from high school and has some college education. R. at 381. Twice married and twice divorced, he is the father of two teenage daughters. R. at 431. His relevant work history includes employment as a convenience store clerk, oil change laborer, pizza delivery man, construction laborer, landscaper, and car wash assistant manager. R. at 169.

In August 2007, Plaintiff was injured. R. at 31. He recalls, "I was hit in the back of my head and then hit [in] my lower back with a [two-by-four]." *Id.* Medical records, however, provide a different account of the injury: "The claimant's head injury was caused by a six foot fall from a balcony [onto a cement slab]. When admitted to the hospital, tests revealed that claimant was significantly intoxicated and had several drugs in his system." R. at 250; *see generally* R. at 333 (providing description of incident resulting in Plaintiff's injury).

After being admitted to the hospital, Plaintiff was diagnosed with a traumatic brain injury, heel cord contractures, and foot deformity. R. at 15. He remained hospitalized for two weeks at St. Mary's Medical Center, followed by a month of rehabilitation at Healthsource Saginaw. *Id.*

### B

Following his injury, Plaintiff underwent physical and psychological testing. On November 8, 2007, Sally Glowicki, M.A., performed a psychological evaluation of Plaintiff. *See*

-4-

R. at 245–251.  Assessing Plaintiff, Ms. Glowicki reported: "The claimant demonstrated poor insight and judgment.  His motivation and self esteem appeared fair. . . .  Reality testing was within normal limits.  One pain behavior was noted.  The claimant hobbled and limped when he walked into the evaluation."  R. at 248.

Ms. Glowicki continued: "The claimant reported having depressive symptoms to include feelings of worthlessness, suicidal ideation, anxiety, sleep disturbance, reduced appetite, weight loss, down mood, loss of interest, trouble with concentration and memory problems. . . .  The claimant reported having significant memory problems and failure to recall his history from the past two years.  The records indicated that his memory impairment was due to a combination of his head injury and alcoholism."  R. at  250.  *Id.*  Ms. Glowicki concluded her evaluation by diagnosing Plaintiff with major depressive disorder, cognitive disorder, pain disorder, nicotine dependence, and alcohol dependence.  *Id.*

On November 28, 2007, Bret Bielawski, D.O., performed a physical examination of Plaintiff.  *See* R. at 254–257.  Dr. Bielawski was informed by Plaintiff that "[h]e is independent in all activities of daily living.  Prior to this injury, he did have some congenital feet abnormalities that he has never paid any attention to. . . .  He states that his left knee seems to bend backwards when he stands.  He thinks he can walk for possibly a block and stand for about 5 minutes."  R. at 254.

After examining Plaintiff, Dr. Bielawski reported: "The patient's immediate, recent and remote memory is intact with normal concentration.  The patient's insight and judgment are both appropriate."  R. at 255.  Dr. Bielawski continued: "Both knees are unremarkable except for the left knee has PCL [posterior cruciate ligament] laxity with hypertension.  . . . .  He has extremely

high arches . . . .  The patient had mild difficulty getting on and off the examination table, cannot walk on his heels, is already walking on his toes and cannot squat." *Id.*  Concluding the evaluation, Dr. Bielawski diagnosed Plaintiff with "congenital high arches," recommending: "Certainly arch supports would help in this regard. . . .  As far as this new numbness goes, I am not convinced that this is from his intracranial bleed.  This may be from alcoholic neuropathy. He does have a long history of alcoholism. . . .  Either way, this gentleman would be unable to climb stairs, ambulate on uneven surfaces, stand for even short periods of time or ambulate for even short periods of time."  R. at 256.

## C

On December 2, 2008, Plaintiff applied for federal disability benefits.  R. at 110. Plaintiff alleged that his disability began about the time he suffered the head injury in August 2007.  *Id.*  He specified that the following conditions limited his ability to work: "Head and back injury, arthritis in feet and back, numb feet, depression."  R. at 128.

Plaintiff elaborated that he "can barely walk[,] can stand short times, have to stand on tippytoes and it['s] hard[,] trouble concentrating, remembering[,] [cannot] sleep, always thinking about what happened to me in the past. [M]y life[']s come to a halt, [I cannot] work and it depresses me.  [I'm] in pain 24 hrs a day."  *Id.*

## D

In February 2009, Anne Tadeo, M.D., performed a psychiatric evaluation of Plaintiff. *See* R. at 449–50.  Dr. Tadeo recorded that Plaintiff's self-reported symptoms included "mood swings, sleep disturbance, decreased appetite, and weight loss.  Poor focus and social isolation." R. at 449.  "The patient stated that he abuses alcohol and the last time he drank was two weeks

ago and he had a fifth at that time.  Patient also smokes marijuana, the last time he used cannabis was the night prior to today's visit," Dr. Tadeo further recorded.  *Id.*

Evaluating Plaintiff's mental health, Dr. Tadeo continued: "He was pleasant and cooperative with good eye contact.  Thought process is goal directed.  Speech was normal in volume, rate and rhythm. . . .  Patient has fair focus, concentration, and memory.  Insight and judgment are fair."  R. at 449. Dr. Tadeo concluded by diagnosing Plaintiff with bipolar disorder, post-traumatic stress disorder, alcohol abuse, and cannabis abuse.  R. 450.

In April 2009, Dr. Bielawski again performed a physical examination of Plaintiff.  *See* R. at 289–91.  Dr. Bielawski recorded that Plaintiff's self-reported symptoms included that he "cannot walk for much more than 25 minutes and can sit and stand for about 15–20 minutes at a time."  R. at 289.  After examining Plaintiff, Dr. Bielawski again found: "The patient's immediate, recent and remote memory is intact with normal concentration.  The patient's insight and judgment are both appropriate."  R. at 290.

Evaluating Plaintiff's physical health, Dr. Bielawski continued: "Both feet have very high arches.  Knee exam was unremarkable and his last exam in November 2007 I noted that the PCL was lax in the left knee which I do not appreciate today.  Grip strength remains intact.  Dexterity is unimpaired. . . .  The patient had mild difficulty getting on and off the examination table, mild difficulty heel and toe walking and mild difficulty squatting."  R. at 290.  Concluding the evaluation, Dr. Bielawski diagnosed that Plaintiff's impairments as "congenital high arches and polyneuropathy . . . .  I still think that this is from his history of alcoholism giving him a permanent alcoholic neuropathy.  Without his boots, he had mild difficulty doing orthopedic

maneuvers.  He states that he wears these heavy boots because they give him more balance which certainly makes sense.  But his exam was really unremarkable otherwise."  R. at 291.

In May 2009, psychologist Michael Brady, Ph.D., performed a psychological evaluation of Plaintiff.  *See* R. at 292–97.  After observing Plaintiff, Dr. Brady reported: "Posture and gait were unremarkable. . . .  Mood was depressed."  R. at 294.  "When asked what he does on a typical day," Dr. Brady continued, "[Plaintiff] reported that he wakes up at 7:00 am.  Morning activities include making coffee and talking.  Afternoon activities include relaxing.  He is currently tearing a porch off [his] mobile home."  R. at 294.

Summarizing his findings regarding Plaintiff's mental health, Dr. Brady wrote: "Results of the mental status examination revealed no abnormalities in mental capacity.  Throughout the evaluation he was cooperative and attentive.  The only discrepancy discover[ed] in the interview was a denial of any history of alcohol abuse.  However, after he was informed that his chart reflected alcohol abuse he disclosed previous and current alcohol use."  R. at 296.  Dr. Brady concluded by diagnosing Plaintiff with major depressive disorder.  *Id.*

In June 2009, Douglas Ruben, Ph.D., also performed a psychological evaluation.  *See* R. 331–41.  Reporting his observations of Plaintiff, Dr. Ruben wrote that Plaintiff "ambulated independently with a normal gait showing no psychomotor disturbance.  He sat comfortably in the chair, and refused another more ergonomically convenient chair.  He made no profound gestural or postural movements.  Attention span and physical stamina were generally strong.  Affect remained upbeat, energetic, spontaneous, dynamic, fluid, elevated, sensitive, and stable.  No anger, resistance, opposition, or psychosis evident."  R. at 335.

Evaluating Plaintiff's reliability as a self-reporter of his symptoms, Dr. Ruben cautioned: "He may elaborate, exaggerate, or overstate symptoms of psychopathology . . . . His construction of past events is questionable. He may unknowingly lack a logical sequence detailing the flow of events, or contaminate his memory of past events with varying interpretations of his actions. He appears a poor and unreliable historian. Consequently, caution is advised against accepting his reporting on face value." *Id*.

Dr. Ruben found Plaintiff to have average reasoning, but below-average memory, reporting: "Speed of cognitive processing and reasoning skills was low average. Interpretation of facts was accurate if facts remained simple. Simple problem solving scored in average ranges with few errors made. Complex thoughts and abstractions were formed incorrectly. Memory deficits were most profound. Immediate recall was weak, delayed, and inaccurate for simple and complex sequences." R. at 339. Dr. Ruben further found Plaintiff to have below-average visual perception of the spatial relationships between objects, explaining: "Limited visuospatial skills may preclude jobs such as computer programming or operating heavy equipment that depends on assessing physical cues in the environment." R. at 338.

Summarizing his findings, Dr. Ruben concluded: "Psychological testing and clinical interview profiles an Intellectually Borderline, endogenously depressive, and interpersonally underdeveloped middle-aged adult." R. at 339. Turning to Plaintiff's job prospects, Dr. Ruben wrote: "At present, the following problems may arise when placed in factory based or construction jobs: (a) reduced endurance and high distractability, (b) rapid apathy, disenchantment, self-anger, and abandonment of the job (quit, abort the task), (c) high turnover

rate to another job, and (d) hide, disguise, or suppress problem with the assigned tasks to prevent detection of his errors."  R. at 341.

**E**

In July 2009, Plaintiff underwent an electromyelgram (a diagnostic procedure designed to assess the health of muscles and nerve cells).  *See* R. 342–44.  The doctor who performed the procedure, J.M. Buday, M.D., reported "[f]indings which are suggestive of possible bilateral L5-S1 involvement."  R. at 343.  "There are some chronic findings in the lower lumbar, upper sacral region," Dr. Buday elaborated.  *Id*.

About this time, Plaintiff also underwent an MRI.  R. at 347.  The radiologist who performed the procedure, Elias Mendoza, M.D., reported: "The disc spaces appear fairly well maintained.  No osteolytic or osteoblastic lesion.  The prevertebral soft tissues appear within normal limits."  *Id*.  He further reported: "The sacroiliac joint appears within normal limits. . . . There is mild to moderate narrowing of the disc space at L4-L5 and L5-S1.  There is spondylolysis [a defect in the connection between vertebrae] at L6."  R. at 345.

**F**

In August 2009, Plaintiff began an eight week course for heavy equipment operation.  R. at 432.  Successfully completing the course, he is now certified as a heavy equipment operator.  *Id*.  Following Plaintiff's completion of his training, Michigan Rehabilitation Services (a state agency) offered Plaintiff a four week "sheltered employment trial" to enable Plaintiff to earn enough money to have his driver's license reinstated (it had been suspended for non-payment of parking fines).  *Id*.  Plaintiff successfully completed the sheltered employment trial.  *Id*.  He has since obtained his driver's license.  R. at 29.

**G**

Plaintiff is currently being counseled by the MPA Group, a mental health services provider. R. at 15; *see, e.g.*, R. at 420–434. Asked about his objectives, Plaintiff asserted: "My goals are the same: to get a job and my own place to live; get my life back together." R. at 427.

On January 4, 2010, an MPA Group therapist, Timothy Fish, met with Plaintiff. R. at 426. Following the meeting, he recorded: "Gene has completed training and is now certified as a Heavy Equipment Operator. He needs to also get his CDL [commercial driver's license] to supplement this certificate." R. at 426. Evaluating barriers to Plaintiff achieving his objectives, Mr. Fish, observed: "His having multiple Felonies on his criminal record will be a barrier to being accepted into public housing. At times he has an indifferent attitude, becomes overwhelmed and feels like giving up. This may have a negative impact on pursuing employment." *Id.*

Mr. Fish did not note any limitations regarding Plaintiff's physical or mental abilities as potential barriers to Plaintiff achieving his objectives. *Id.* In an addendum produced about this time, Mr. Fish also noted "Gene is able to perform household tasks independently despite his chronic pain and limited range of motion. He is, admittedly, a little lax, however, when it comes to routine chores and many times 'things don't get done' which adds to his frustrations and feelings of being overwhelmed." R. at 433.

**H**

On June 16, 2010, psychologist Thomas Seibert, M.S., evaluated Plaintiff. *See* R. at 378–95. Addressing Plaintiff's foot problems, Mr. Seibert reported: "Mr. Zube suffers from high arches, which cause him to have problems with his feet. He indicated that these problems do not

cause functional limitations for him." R. at 379–80. Turning to Plaintiff's head injury, Mr. Seibert continued: "Since suffering this head injury, Mr. Zube has had reduced memory, concentration, and balance. He denied that he stumbles or falls. 'I walk on my tiptoes sometimes,' Mr. Zube stated. . . . He denied that his problems with concentration have created difficulties for him in the school, work, or social settings." R. at 380 (emphasis omitted).

Assessing Plaintiff's intelligence, Mr. Seibert found: "Mr. Zube is functioning in the borderline range of intellectual ability. . . . [He] has average reading recognition and reading comprehension skills. . . . Mr. Zube has average math skills." R. at 382, 384. Regarding Plaintiff's work interests, Mr. Seibert continued: "Mr. Zube expressed little enthusiasm for operating computers, sales work, employment as a nurse, working in the field of science, childcare work, secretarial work, and work that is not dirty. . . . Overall, Mr. Zube is most highly interested in occupations in the mechanical vocational area." R. at 389, 390.

Summarizing his assessment of Plaintiff, Mr. Seibert concluded: "The present evaluation indicates that Mr. Zube is not capable of pursing employment as an industrial engineering technician or mining engineer. . . . [H]is ability to work as an industrial truck operator, crane operator, or heavy equipment operator is in doubt because of the severity of his brain injury. . . . Mr. Zube's strengths include his strong work ethic, his possession of a high school diploma, his average reading recognition, reading comprehension, spelling, and math skills." R. at 394–95.

# I

After Plaintiff's disability application was initially denied by Defendant, Plaintiff filed a written request for a hearing before an administrative law judge. R. at 13. On August 19, 2010,

the hearing was held. *Id*.; *see* R. at 25–44 (transcript). Plaintiff, represented by counsel, appeared and testified. R. at 13. His counsel asked Plaintiff to describe his disability:

> Q: [S]o let's talk about, kind of fast forward to what kind of problems you're having now. You having any back pain?
> A: A lot of back pain.
> Q: Okay, is it a constant pain or pain that just comes and goes?
> A: Constant.
> Q: Okay. Is it in your middle, upper or lower back?
> A: My lower back.
> Q: Okay. And then, what about any problems with your leg as far as pain or numbness?
> A: Yes, my feet too.
> Q: Okay, what kind of problems do you have with your legs?
> A: They just always hurt. I get cramps in them. Just like my feet, my feet go numb. Constant pain.
> Q: All right. And you mentioned about your feet and ankles, what's causing that, you know?
> A: I have no idea. . . .
> Q: [D]o you have any problems walking now?
> A: Yes, I do.
> Q: What kind of problems?
> A: I can only walk so often, I got to stop. My feet swell up on me, they go numb on me.
> Q: Do you have any problems with balance?
> A: All the time now.
> Q: Okay.
> A: Sometimes like I don't hold something just to walk.
> Q: All right. What about walking, let's say, on uneven surfaces like, say ground, you know, ground or going up and down curbs?
> A: I have a hard time doing that.
> Q: Okay. What about inclines, ramps? Yes?
> A: Yes.
> Q: Now, you have any problems understanding or remembering things?
> A: Yes, I do. . . .
> Q: Do you lay down or did you recline at all during the day because of pain?
> A: Sometimes I do.
> Q: Let's say in a seven-day week, how often would you need to recline or lie down due to pain?
> A: About four days of the week.
> Q: Four out of the seven?
> A: Yes.
> Q: And when you do lie down and recline, how long do you need to do it for?

> A:  There's times where I'll do it for a couple hours, half hour, it's all varied.
> Q:  So between 30 minutes to a couple hours?
> A:  Yes. . . .
> Q:  Okay, how far can you walk before you get off, before you have to stop or get off your feet?
> A:  It's all varied, too.  Maybe two blocks, three blocks, and then I got to stop.
> Q:  Because of, why do you have to stop?
> A:  My ankles, my feet.
> Q:  Okay.  What about, can you bend over, pick something up off the floor okay?
> A:  It's kind of hard.
> Q:  Okay.  What about sitting?  Do you have any problems sitting?
> A:  Little bit, I do, yes.
> Q:  How long can you sit in a chair like this?  Padded chair with the wooden arms?
> A:  Probably 20 minutes. . . .
> Q:  Now, do you have any problems with headaches?
> A:  Not as bad as I used to but I still get severe headaches.
> Q:  How often?
> A:  I think it's twice a month I get them now.
> Q:  All right.  Are the[y] the kind where you need to lie down in a dark room  or not?
> A:  Yeah. . . .
> Q:  Okay, So, we talked about your problems with your back, your legs, your ankles, your leg numbness, losing your balance, problems thinking or concentrating, memory, reading.  Did we cover everything?  That's not a trick question.  I just want to make sure we covered everything so the judge knows all your impairments.
> A:  I think we basically did.  Yes, sir.

R. at 32–39.  Plaintiff further testified that he regularly performs "chores around the house," including cleaning, vacuuming, dusting, washing dishes, and doing laundry.  R. at 36–37.  He shops for groceries and will work in the yard "if the landlord wants me to do something."  R. at 37.  Plaintiff also testified that he is capable of lifting up to twenty pounds.  R. at 38–39.

An impartial vocational expert, Melody Henry, also testified at the hearing.  R. at 40–43.  She was asked by Judge Ransom:

> Q:  Assume for me if you would that [a hypothetical person] could perform light work, but he'd require a job with the following restrictions:  he'd need a sit-stand option at will, with occasional [sic]; and no repetitive bending, twisting

-14-

or turning; occasional crawling, squatting, kneeling and stair climbing, no air or vibrating tools; no working around unprotected heights or moving machinery; no working on uneven surfaces; and he'd require a job with limited contact with the public; it would need to be simple, repetitive, regular-paced work with occasional supervision and no constant close attention to detail. Assume those facts, in your opinion, would there be jobs in existence in significant numbers in the regional economy that he could perform?

A: Yes. In the light and unskilled for the region —

Q: Oh, including any of his past work.

A: Looking at past work. I don't believe that any of the past work would accommodate the fully discretionary sit-stand option. So we'll be looking at other jobs that might exist in the light and unskilled. Such a worker could perform a hand packer position; 6,000. An office machine operator position; 1,300. A sorter position; 1,700 in [the] economy.

R. at 41–42.

By decision dated September 20, 2010, Judge Ransom concluded that Plaintiff was not disabled. R. at 13–20. Applying the five-step disability analysis, Judge Ransom found at step one that Plaintiff has not engaged in substantial gainful activity since November 14, 2008. R. at 15. At step two, Judge Ransom found that Plaintiff has four severe impairments: (1) "status post head and back injury arthritis"; (2) "high arches"; (3) "major depression"; and (4) "cognitive disorder." *Id.* At step three, Judge Ransom found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listings in the Code of Federal Regulations. R. at 16–17. Judge Ransom then found that Plaintiff has the "residual functional capacity" to perform

light work as defined in 20 CFR 416.967(b) in a job that provides for a sit/stand option with no repetitive bending, twisting or turning, with occasional crawling, squatting, kneeling and stair climbing; with no use of air or vibrating tools, no work at unprotected heights or around moving machinery, with limited contact with the general public, performing simple routine tasks; with no work that requires constant close attention to detail, with only occasional supervision and all work at only a regular pace with no work on uneven surfaces.

R. at 17–18.   Regarding Plaintiff's limitations, Judge Ransom elaborated: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible."  R. at 18.  Illustrating his conclusion, Judge Ransom noted: "The claimant has not required chronic treatment for his alleged head injury and lower back pain. . . . . Further he has sought almost no treatment during all of 2008. . . .  Records from MPA as of December 23, 2009, confirm the claimant had completed training and was now certified as a heavy equipment operator.  While Dr. [Ruben] advised against performing that job, the fact that he was able to complete training successfully reflects an ability to learn and complete jobs training.  While the claimant sustained a significant head injury and requires restrictions, he is able to perform restricted work."  *Id.*

At step four, Judge Ransom found that Plaintiff could not perform any of his previous work.  R. at 18–19.  At step five, Judge Ransom found that Plaintiff could perform a significant number of jobs available in the national economy and therefore "not disabled."  R. at 19–20.

**J**

Following Judge Ransom's decision, Plaintiff requested that Defendant's appeals council reverse the decision.  R. at 7–9.  The council declined to do so, rendering a final decision denying Plaintiff's application on May 13, 2011.  R. at 1–4.  This appeal followed.

On July 1, 2011, Plaintiff filed suit in this Court.  ECF No. 1.  The case was referred to Judge Randon pursuant to 28 U.S.C. § 636.  ECF No. 3.

In November 2011, Plaintiff moved to remand the case pursuant to sentence four of 42 U.S.C. § 405(g).[1]  ECF No. 12.  Plaintiff asserted that Judge Ransom "erred in formulating a hypothetical and resultant RFC [residual functional capacity] by understating the claimant's restrictions."  Pl.'s Mot to Remand 3.  Because of the severity of Plaintiff's physical and mental limitations, he argued, Judge Ransom's conclusion that Plaintiff was capable of performing light work is not supported by substantial evidence.

In January 2012, Defendant moved for summary judgment.  ECF No. 15.  Regarding Plaintiff's physical limitations, Defendant asserted that the evidence demonstrates that Plaintiff is physically capable of performing light work.  "The record does contain evidence of Plaintiff's difficulties walking due to possible alcoholic neuropathy and high foot arches," Defendant acknowledged, but continued: "it also documents that on other occasions, his ability to walk was not as impaired, which supports the ALJ's RFC finding."  Def.'s Mot. Summ. J. 16.

Regarding Plaintiff's mental limitations, Defendant asserted that Judge Ransom "accommodated a potential difficulty with work complexity by limiting Plaintiff to simple routine tasks with no constant close attention to detail, and addressed Plaintiff's possible problems with frequency of task completion by limiting him to only regular paced work."  *Id*. at 19 (internal citations omitted).

In June 2012, Judge Randon issued a report and recommendation on the cross-motions.  ECF No. 17.  Judge Randon recommended that the Court deny Plaintiff's motion, grant Defendant's motion, and dismiss the complaint.

---

[1] Sentence four provides: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").  § 405(g).

Plaintiff timely filed two objections to the report and recommendation.  ECF No. 18.

**III**

**A**

Plaintiff first objects that his physical limitations are not accounted for in the assessment of his residual functional capacity.  Specifically, Plaintiff argues: "Substantial evidence in the RFC is lacking in the ability to perform the walking and balancing requirements of light work." Pl.'s Objections 4.  Moreover, Plaintiff asserts, Judge Ransom's conclusion regarding Plaintiff's "ability to walk up to 25 minutes and sit and stand for about 15-20 minutes at a time has never been reconciled by ALJ Ransom in light of the objective evidence."  *Id*. at 4.

Contrary to Plaintiff's contention, substantial evidence supports Defendant's determination that Plaintiff possessed the residual functional capacity to perform light work with a sit/stand option.  And Plaintiff himself acknowledged an "ability to walk up to 25 minutes and sit and stand for about 15-20 minutes.  R. at 289.

"Light work," the Code of Federal Regulations provides in pertinent part, means that a person is capable performing a job that either  "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

In Dr. Bielawski's first physical examination of Plaintiff, performed in November 2007, Dr. Bielawski concluded:  "this gentleman would be unable to climb stairs, ambulate on uneven surfaces, stand for even short periods of time or ambulate for even short periods of time."  R. at 256.  But Dr. Bielawski's subsequent physical examination of Plaintiff, performed in April 2009, Dr. Bielawski observed that marked improvement had occurred in the eighteen months since the

doctor had last examined Plaintiff.   The doctor first recorded that Plaintiff's self-reported symptoms included that he "cannot walk for much more than 25 minutes and can sit and stand for about 15–20 minutes at a time."   R. at 289.   After observing Plaintiff's movements, Dr. Bielawski noted: "The patient had mild difficulty getting on and off the examination table, mild difficulty heel and toe walking and mild difficulty squatting. . . .   Without his boots, he had mild difficulty doing orthopedic maneuvers.   He states that he wears these heavy boots because they give him more balance which certainly makes sense.   But his exam was really unremarkable otherwise." R. at 290, 291.

   In Dr. Brady's examination of Plaintiff in May 2009, Dr. Brady similarly reported: "Posture and gait were unremarkable."   R. at 294.   "When asked what he does on a typical day," Dr. Brady continued, "[Plaintiff] reported that he wakes up at 7:00 am.   Morning activities include making coffee and talking.   Afternoon activities include relaxing.   He is currently tearing a porch off [his] mobile home."   R. at 294.   Tearing a porch off a mobile home suggests not that Plaintiff is incapable of doing "light work," but that he may be able to perform more than merely light work.

   Dr. Ruben examined Plaintiff in June 2009.   Reporting his observations, Dr. Ruben wrote that Plaintiff "ambulated independently with a normal gait showing no psychomotor disturbance. He sat comfortably in the chair, and refused another more ergonomically convenient chair.   He made no profound gestural or postural movements.   Attention span and physical stamina were generally strong." R. at 335.

   On June 16, 2010, Mr. Seibert evaluated Plaintiff.   Discussing Plaintiff's foot problems, Mr. Seibert reported: "Mr. Zube suffers from high arches, which cause him to have problems

with his feet.  He indicated that these problems do not cause functional limitations for him."  R. at 379–80.  Turning to Plaintiff's head injury, Mr. Seibert continued: "Since suffering this head injury, Mr. Zube has had reduced memory, concentration, and balance.  He denied that he stumbles or falls.  'I walk on my tiptoes sometimes,' Mr. Zube stated. . . .  He denied that his problems with concentration have created difficulties for him in the school, work, or social settings."  R. at 380 (emphasis omitted).

At the hearing before Judge Ransom in August 2010, Plaintiff testified that he regularly performs "chores around the house," including cleaning, vacuuming, dusting, washing dishes, and doing laundry.  R. at 36–37.  He also shops for groceries and will work in the yard "if the landlord wants me to do something."  R. at 37.

In sum, no physician suggests that Plaintiff is unable to perform the walking and balancing requirements of light work with a sit/stand option.  (Dr. Bielawski, as noted, revised his initial diagnosis in April 2009.)  On the contrary, the observations of doctors Bielawski, Brady, and Ruben, as well as Plaintiff's own statements, suggest Plaintiff is able to perform the walking and balancing requirements of light work with a sit/stand option.

The record contains sufficient evidence to provide a rational inference that Plaintiff's physical limitations do not preclude him from performing light work with a sit/stand option.  Plaintiff's first objection will be overruled.

**B**

Plaintiff next objects that his mental limitations are not accurately accounted for in the assessment of his residual functional capacity.  Specifically, Plaintiff asserts, the record does not contain substantial evidence that he is able "to perform simple, routine tasks at a regular pace."

Pl.'s Objections 5.  Moreover, Plaintiff asserts, the assessment does not account for his "weak and underdeveloped psychosocial skills and emotional immaturity."  *Id*. at 7.

Contrary to Plaintiff's contention, substantial evidence supports Defendant's determination that Plaintiff possessed the residual functional capacity to perform light work "with limited contact with the general public, performing simple routine tasks; with no work that requires constant close attention to detail, with only occasional supervision with all work at only a regular pace."  R. at 17–18.

Dr. Bielawski performed physical examinations of Plaintiff in November 2007 and April 2009, reporting on both occassions: "The patient's immediate, recent and remote memory is intact with normal concentration.  The patient's insight and judgment are both appropriate."  R. at 255, 290.

Dr. Tadeo performed a psychiatric evaluation of Plaintiff in February 2009, reporting: "He was pleasant and cooperative with good eye contact.  Thought process is goal directed. . . . Patient has fair focus, concentration, and memory.  Insight and judgment are fair."  R. at 449.

Dr. Brady performed a psychological evaluation of Plaintiff in May 2009.  After observing Plaintiff, Dr. Brady reported: "Results of the mental status examination revealed no abnormalities in mental capacity.  Throughout the evaluation he was cooperative and attentive. The only discrepancy discover[ed] in the interview was a denial of any history of alcohol abuse. However, after he was informed that his chart reflected alcohol abuse he disclosed previous and current alcohol use."  R. at 296.

Dr. Ruben performed a psychological evaluation of Plaintiff in June 2009.  Finding Plaintiff to possess average reasoning abilities, Dr. Ruben reported: "Speed of cognitive

processing and reasoning skills was low average.  Interpretation of facts was accurate if facts remained simple.  Simple problem solving scored in average ranges with few errors made." R. at 339.

In August 2009, Plaintiff began an eight week course for heavy equipment operation.  R. at 432.  Successfully completing the course, he is now certified as a heavy equipment operator. *Id*.  Following Plaintiff's completion of his training, Michigan Rehabilitation Services (a state agency) offered Plaintiff a four week "sheltered employment trial" to enable Plaintiff to earn enough money to have his driver's license reinstated.  *Id*.  Plaintiff successfully completed the employment trial.  *Id*.  He has since obtained his driver's license.  R. at 29.

In January 2010, therapist Timothy Fish met with Plaintiff.  R. at 426.  Plaintiff informed Mr. Fish that Plaintiff's objectives were obtaining "a job and my own place to live."  *Id*.  Mr. Fish observed: "His having multiple Felonies on his criminal record will be a barrier to being accepted into public housing.  At time he has an indifferent attitude, becomes overwhelmed and feels like giving up.  This may have a negative impact on pursing employment."  *Id*.  Mr. Fish did not, however, report that Plaintiff's cognitive abilities would limit his ability to obtain employment.  *Id*.

On June 16, 2010, Mr. Seibert evaluated Plaintiff.  Assessing Plaintiff's intelligence, Mr. Seibert found: "Mr. Zube is functioning in the borderline range of intellectual ability. . . .  [He] has average reading recognition and reading comprehension skills. . . .  [He] has average math skills."  R. at 382, 384.  Regarding Plaintiff's work interests, Mr. Seibert continued: "Overall, Mr. Zube is most highly interested in occupations in the mechanical vocational area."  R. at 389, 390.  Summarizing the obstacles to Plaintiff performing this type of work, Mr. Seibert

concluded: "[Plaintiff's] ability to work as an industrial truck operator, crane operator, or heavy equipment operator is in doubt because of the severity of his brain injury. . . .  Mr. Zube's strengths include his strong work ethic, his possession of a high school diploma, his average reading recognition, reading comprehension, spelling, and math skills."  R. at 394–95.  Mr. Seibert did not report that Plaintiff would be unable to perform simple routine tasks with no work that requires constant close attention to detail.

In sum, Plaintiff is correct that the record contains some evidence that his mental limitations affect his ability to work.  As detailed above, however, the record also contains sufficient evidence to provide a rational inference that Plaintiff's mental limitations do not preclude him from performing light work involving "limited contact with the general public, performing simple routine tasks; with no work that requires constant close attention to detail, with only occasional supervision with all work at only a regular pace."  R. at 17–18.  Plaintiff's second objection will be overruled.

## IV

Accordingly, it is **ORDERED** that Plaintiff's objections to Judge Randon's report and recommendation (ECF No. 18) is **OVERRULED**.

It is further **ORDERED** that the Judge Randon's report and recommendation (ECF No. 17) is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion to remand (ECF No. 12) is **DENIED**.

It is further **ORDERED** that Defendant's motion for summary judgment (ECF No. 15) is **GRANTED**.

It is further **ORDERED** that the determination of the Commissioner of Social Security is

AFFIRMED and that Plaintiff's complaint (ECF No. 1) is **DISMISSED** with prejudice.


                                    s/Thomas L. Ludington
                                    THOMAS L. LUDINGTON
                                    United States District Judge
Dated: August 1, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on August 1, 2012.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS